The final case for argument is 23-2074, Cytivia Bioprocess v. JSR. Good morning, Your Honor. Good afternoon. Candidly, I have no idea whether it's morning or afternoon. It's afternoon. Well, I'm mindful that I'm the last argument on a Friday, but hopefully we'll make it interesting. It'll be under two hours. May it please the Court. I'd like to start with the issues on the independent claims and our argument on lead compound. The Board here erred by skipping what is the required first step of any obviousness analysis, which is to ask what the person of ordinary skill in the art would have done. What did they have reason to do? How would they have confronted the problem before them? And that principle, which is not limited by any means to the chemical arts, is articulated in the chemical arts in this Court's lead compound. Okay, but, I mean, even the cases that seem most strident, I don't mean that in the pejorative sense about lead compounds, they don't, it's not mandatory. And in this case, I mean, it is, it applies if it makes sense. And it makes sense if there are thousands of things out there, whatever. Here we have a finite class, and I don't know, it just seems to me that in these circumstances, they would have selected those asserted compounds because the prior art already suggested it. Doesn't this sound, I mean, we can apply lead compound and say these are lead compounds, or we can say lead compound doesn't, you know, doesn't apply here. So I think my response to that would be to observe that, and with all respect, Your Honor is assuming the conclusion when you say that there's a finite number because the board... Just to narrow it, everybody agrees that in the field, SPA was a widely used ligand for IgG, and so that's a reason enough to be examining the possibilities within the SPA world, of which there were five wild-type possibilities. Five wild-type possibilities. Right, and then you can start, and only one I think anybody's been discussing about... Correct. ...the modification that a B to create a Z. And that's the issue. I think, Your Honor, this would be a different case if the board had found, or if anyone had submitted evidence, that there was reason there's the advantage to use a wild-type ligand. That's not what people in the field at the time were doing. Every single piece of prior art that was asserted in the grounds here started somewhere else. The notion that there's only five possibilities is wrong because the board itself found that Lindholt, for example, taught... Lindholt's the one that says there's something good about all five of the domains within SPA. So a Bromson refers to all five and says you can make a G29A modification to all five in passing. Well, isn't that enough of a starting point to say, well, we're going to test, among others, C. And we might not do B because we know that at least one bad thing happens. Because, Your Honor, a Bromson isn't solving the same problem. A Bromson is not addressing the problem of a chromatography ligand. The proteins there were being used in fusion proteins that were attached to other proteins that were being purified. It was a very different use case. What was missing from this record, what was missing from the arguments in the petition, and what was missing from the board's decision was a finding that a person of ordinary skill in the art designing a new chromatography matrix or a method of using such a chromatography matrix, which is what these claims are directed to, would have gone back. Instead of looking where the art that was asserted actually pointed, which was these different non-natural improved versions of domain B, would have reset the clock and said, oh, no, we're instead going to start with one of the five naturally occurring domains. Okay, so why, even if you're right, why can't you use the four additional, the natural CPA domains, including domain C, and treat them all as three comma? Because there needed to have been, there was no such finding here, and there was no such evidence here that that was what the POSA would have done. Right, I thought there was evidence, that is, the fact finder could infer from the various statements, including in Abramson, about the five compounds that each would be, I don't mean to use a contentious word, but each would be obvious to try. And the lead compound analysis requires asking the question of when the POSA is addressing a particular problem here, how to make a new and improved chromatography ligand, what are they going to start with? There was never an argument, there was never evidence, there was never a finding that those five naturally occurring domains would be a chosen lead. What sense would it make in a situation of which maybe this is one, but I'm trying to make it kind of a hypothetical. If you really had, you know, five possibilities, you don't really know what the distinction is to say, you need an affirmative reason to say that possibility two is better than one through five, when you just have no idea, and the experiment is really cheap and easy. Taking that hypothetical, that when you have only five possibilities, I agree with your honor, but that's not the reality here. That might be, like, for example, in KSR, you had the type of simple situation where the question was, you know, where can you put a sensor on a brake pedal and there's only so many possibilities. I'm trying to separate the doctrinal demand that I think you're making from the facts here. I take it you say there has to be a reason to pick just one above everything else in the world, and that seems, I don't know, extreme. And I think that, with respect, is not the argument I'm making. The argument I am making is that there needs to be, and this is a flexible inquiry, some reason to start where the buzzard is. It might not be the one and only possible starting point, but there has to be some articulable reason that the fact finder, like the board, needs to identify why the person of ordinary skill in the art would, contrary to the references asserted... I don't remember at this point. Did the petition at least include, for example, the binding properties shown in that trio of bar charts in Janssen? And C seems, you know, maybe even a little bit better on some things than A, B, D, and E. So the thing that C is a little bit better on in those bar charts, and this is not a ground that the board relied on, was on G29... excuse me, was on fab binding. But the board found, correctly in our view, that there would not have been an expectation that fab binding would be preserved upon making a G29A modification. So to the extent there's a reason to use C, it wouldn't be a reason to use C when making a G29A change. Before your time runs out, because we can't let... Yeah, absolutely. ...the time today, let me turn to the dependent claims. Sure. And this is a question for both you and the other side, which is you both kind of agree, arguably, at least maybe tentatively, that the dependent claims should be treated the same, that there's no distinction between composition and process for purposes of whether or not you apply reasonable expectation, require reasonable expectation of success. You obviously both come up with absolutely different answers to that question, but one, is that fair? I don't think that's fair. I thought one of your arguments was that there was no basis for treating this, the one in the first case, the one in the main appeal, differently from the other one in terms of having to apply the expectation. Well, the reason is not some technical legal reason. The reason is that the claim language is different. The composition claims require that they be capable of binding to the fab part of an antibody. The method claims require that they actually do so, and so in order to prevail on the cross appeal, they would have needed to show that it, to take their first cross appeal argument, they would need to show that when the person of skill does what the board found would have been obvious, which is use these to purify whole antibodies, where there would not have been any expectation of fab binding, there would have been an expectation of FC binding, that every time that happens, inherently, fab binding occurs. In other words, they would have needed to prove not just that fab binding, capability of fab binding sometimes is an inherent property, but that when that method that would have been obvious is performed, there is, in fact, fab binding to the fab part of a whole antibody. That's a very different inquiry from does this composition possess the property of being capable of binding, at least sometimes, to the fab part of an antibody. And this is, I'd like to direct the Court's attention to This is really important, I'm sorry. So, a couple, a little group of questions. What do you think capability means in the 765? So capability means that there is, at least as to some fabs, and fabs are not all identical in sequence, this wasn't developed here just because of the way the record came together and the arguments JSR made, but at least in some circumstances, there is some degree of binding to the fab part of an antibody. And that's, I'm sorry, and that's the inherent property that would be relevant for the 765 inquiry. Not that it always binds to the fab part. Correct, but that capability is there. Now, on the two method claims, it doesn't say capability. It says go through these steps, and the ligand binds to a fab part of an antibody. Put aside the labeling of the ligand, we're going to get to the fragment question later. But then you started talking about inherency on that claim, and that's because it wasn't, there was no establishment of an expectation that that would happen. The only way that challengers could prove that element was met is through an inherency analysis. Correct, it's through an inherency analysis. That would then allow them to say about that, what they said about the compound claim, which is that it's carried along with whatever, with all of the actual physical steps. But JSR didn't argue, and the experts here didn't therefore address, the question of when you purify whole antibodies in one of these matrices, whether in fact inherently there's binding to the fab part of an antibody when there's also an FC part present it could bind to. And for that matter, how often it happens. I want to direct the court's attention to appendix 2210. This is an excerpt from the argument that my friend on the other side made before the board, and this was criticizing the data about fab binding in domains. Which volume of the appendix? I see. Great, thank you. Thank you. And he said, and again this is talking about the disclosure in the patent, he said, you know, we're not even talking about fab fragments, we're talking about, yes, it can bind to some fab portion of some antibody somewhere in some circumstance. That's what, how my friend characterized the meaning of this capability. That is a far cry from the required showing that every time you purify a whole antibody, inherently the natural result of doing so, or something that happens with certainty every time you do so, is binding to the fab part of an antibody. There's no development in this record at all of whether inherently that occurs in a process. And that's a critical distinction between the claims. Okay, so here's what I guess. Some of this may be a language issue or it may be. So it sounds to me like the thing that is inherent, the property that is inherent is different, in your view, between the analysis of the 765 and the analysis of the method claims. Because all you need for, I guess, I need, I guess, for inherency on the 765 is that there is a capability that is inherent. You say for the method claims, they have to show that there would be what? In fact, when the method steps are carried out, it binds to the fab part of an antibody, because that's what the claim says.  Well, the claim requires that, you know, the process of claim one wherein the ligand binds to the fab part of an antibody. And that binding, that present tense verb binds, everyone agrees it would occur. But say if you ran this process 100 times and it didn't bind 80 times, it did bind 20 times, you would have 20 infringements. Well, so everyone agrees that it would occur if you purified fab fragments that are of interest to purify, because there's no FC portion to go on to. There's nothing in this record to suggest whether it occurs one time or 20 times or 99 times. JSR simply didn't argue. If you go back to its petition, which is in the JA, I should have the citation here. I apologize. There's six petitions, but the first of them is at Appendix 587 to 589. Compound one or method one? This is the first of the method ones. It's the first petition on the 142 in the JA. And basically the same text is in all four of the about method claims. But they have a single paragraph argument on inherency that talks about this being a property of the ligands, along the lines Your Honor is suggesting. But what they don't argue is that when you purify a whole antibody, never mind expectations, never mind anything else, inherently it occurs. There's just no argument or evidence developing the fact that when you do this thing that would have been obvious, that actually happens. Why isn't it right to say the capability that's relevant in 765 is that sometimes it will occur? Inherently it will sometimes occur. Same thing is true for the method claims. And if we're trying to show that the prior art in combination makes it obvious, all we need is that this claim will cover, you know, the 20 out of 80 out of 100 instances in which it does occur. And so since the claim is covering that, there's no difference between the compound and method claims. Well, and perhaps it does bind and we'll have, I'm sure we'll have a fulsome argument about that on infringement if this goes back to the district court. But in this record, there's been no analysis of whether when you have an antibody that has both an FC region and a FAB region, you pass it through one of these columns where the same ligands are capable of binding to the FC portion of the antibody or to the FAB portion of the antibody. There's no development of whether always, sometimes, or never, there's binding to the FAB portion of the antibody. And there's certainly no, nothing to suggest that, you know, the usual standard for inherency is met, which is that it's a natural result or an inevitable outcome of using one of these ligands, matrices, to purify a whole antibody. That's just, I mean, it's an argument perhaps they could have made, perhaps the experts could have, you know, induced opinions or, you know, data on whether when you do a whole antibody purification, ignorant of the fact that there might be FAB binding going on, you're, you know, the expectation is that FAB binding is not going to occur here. The, you know, the experts could have opined about whether and to what degree and in what circumstances there is FAB binding to that portion of the antibody. But that's just absent from this record. And I think appeal is too late to bring that up as an inherency argument. And so the district, excuse me, the board's ruling on the method claims is therefore supported by substantial evidence. You know, the POSO would not have had reason to use these things to purify FAB fragments where there would be reason and expectation. Well, we spent a lot of time, and that's on me, on the cross appeal, which is sort of jumping the gun. But let's hear from the other side and we'll reserve some time for that. Sure, sure. I was just trying to ask questions on any other issues. Okay. Thank you. Thank you. May it please the court. Eric Dutton for JSR. I want to start where we just left off with the inherency issue and explain what might be a little bit of a misunderstanding here. Our inherency argument is based on Satiba's own representations and its patents, which he took at face value, about the inherent ability of these claimed ligands to bind to the FAB portion of antibodies as well as the FAB fragments. Satiba never contested that its patents made that representation, which is permissible under this court's case law, like N. Ray Kao and Hospier and others. And not only did Satiba not contest this inherency, he actually embraced it in arguing unexpected properties both for the patent composition claims as well as the method claims on appeal, and I'm happy to give those citations. On the method claims, it's Appendix 1499, and for the composition claims, it's Appendix 28, the board noting their argument that this is an inherent property. And so this is... I'm sorry. And then this is that sometimes FAB binding occurs. Yes. And the FAB binding here, I'm right now not distinguishing between the situation where the FAB is still in situ and when the FAB is separated. Yes, and part of the issue is, as was noted, the claims are agnostic in terms of what antibody we're talking about, what potential FAB fragment is being discussed. And so obviously if you have a part of a claim, an embodiment is invalid for obviousness, for inherency, the whole claim goes down. It's a separate inquiry whether every single time it's done is there an infringement or not. But we have the representations in Satiba's own patents that this binding will necessarily occur for certain antibodies. They said that expressly. We relied upon that. In our petitions, Satiba never came back and said, no, that's wrong, let me show you some instances where this binding doesn't occur. They never did that. And again, they embraced it even more so to say, our claim compositions, our claim methods have unexpected results. They actually have this binding. I also wanted to briefly point your honors to Appendix 6288. Can I just be clear about one thing? So when you say the patent says capability of binding to FAB, this is about this Domain C thing in general, that the only reference to making the G29A switch is in that one sentence, and there's nothing more specific about the G29A modified C and its FAB binding or what? Yes, there are representations first in the abstract. It represents that the ligands of the present invention are capable of binding FAB fragments of antibodies. Also, Column 5, Lines 32 to 37, there's a representation of the present invention. Ligands are capable of binding to the FAB. I'm sorry, what was the second one? I'm sorry, Column 5, Lines 32 to 37. I'm sorry, I'm trying to be mindful of the time. And it talks about the present invention. The ligands are capable of binding to the FAB part of antibodies. So that's okay. Just so that I guess I'm clear, the present invention except for the reference to that one embodiment on, I guess, Column 6, Lines 49 to 53, doesn't involve G29A switch. Well, that's the point, is that they're representing that's covered by their invention. Okay. I just wanted to be clear. I wasn't missing something more specific. No, absolutely. So those three passages, and there's also Column 2, Lines 59 to 63, which of course is the foundation that Poe's understood that the natural domains also had this ability to bind to FAB. Which is the only thing they tested, right? What's that? It's the only thing they tested. The figures, right, are the two figures don't involve the G29A. That is correct. Right. But so we've taken that face value, what they said in their patents about their purported inventions having this FAB binding characteristic, and we've used that to say that, okay, we believe that's proper proof of inherency under this court's case, and other decisions, and it was incumbent upon Sativa, if they felt that this wasn't an inherent property, that they would dispute that in some form. They, of course, have the data. They have all the work that they've done here. We didn't see any of that, and again, all we saw was them double down on it by saying it's an unexpected inherent property of whether it's the composition or the method, which I've pointed your honors to in the appendix. But what I do want to think is also important, this notion of the district court applying the wrong claim construction. Obviously, the focus on- The court? I'm sorry, the board, and I apologize, your honor. Thank you for correcting me there. We're still talking about the cross appeal. Yeah, we're now talking about the cross appeal, yes. This is appendix 104, note 12, where the board distinguished between binding to FAB fragments versus binding to antibodies as a whole. It's now not disputed between the parties that the correct construction is that you're not just limited to FAB fragment binding, that you can talk about FAB portions of the antibodies as a whole. Right. I mean, I think you're certainly material in the board's opinion suggesting it was thinking about the isolation of a separated FAB piece. I'm not quite sure whether the word FAB fragment is limited to that or whether the term FAB fragment under that definitional portion in the spec actually applies, regardless of whether the FAB is in situ or separated. But my question is, what difference does that make? It makes- What difference does it make that the board was not focusing on what the claim clearly is about, which it certainly includes, binding to the FAB portion of the antibody when the FAB portion is still part of the antibody? In that footnote 12, I just pointed your honor to the board understood that an additional step to sort of isolate this FAB fragment from the whole antibody in order to then perform a separation was required. And that's why I thought that there was an additional step you needed to show inherency in that circumstance. And they said, this is different, what you're arguing about, the capability of binding to the FAB portion of the antibody. I guess what I'm trying to focus on is, in one of the- Is there a separate isolating step in either of the two method claims? They're slightly different. There's cleaning is in one and cleaning is not in the other, right? They're all directed to a conventional, and there's no dispute about that, separation techniques for a whole antibody. And that's at least covered in part. There's also covering the possibility of a FAB fragment that's separate isolated, but that's the point. The board understood it to be limited to only isolating FAB fragments. Is there any reason to think that just on the binding question, FAB binding, there are- It might make a difference whether the FAB chain is attached to the rest of the antibody or not? Yes, and that's- We have appendix 6288, which I was trying to point your honors to, our expert, Dr. Kramer, was asked after a number of questions by my colleague on the other side about what the claims mean, and he made clear he's talking about binding to the FAB portion of the antibody as a whole. And then he said in that context, yes, it will necessarily happen. That's an inherent property. And he actually was asked another question. He said it would happen and clarified he's talking about binding to the FAB part of an antibody. Again, this is appendix 6288. And that is direct evidence of at least for certain antibodies that are covered by these claims, you're going to have an inherency. And there's no evidence from the other side to contradict that. Again, only embracing it for purposes of unexpected results. What we're talking about here is a binding mechanism. In the court's recent decision, Inrei Kuvar said, if you're talking about a mechanism of action, that's what this is really. It's just how do these ligands bind to antibodies to help separate? It's a known function that's been used in the art for decades. And we're only talking about how that mechanism actually works. And that cannot provide a basis for patentability. That's all that's being claimed here is this capability. I do want to briefly touch on lead compound just because I started on the cross-appeal and the inherency points. Unless your honors have more questions on that, I wanted to at least spend a minute or two. And another minute or two on maybe the two cases that come up in a certain context is Hespera and Honeywell. And if you could give us your take on those. Of course, I will definitely do that. So just very briefly, in terms of the lead compound, this is not a case that involves a modified version of a prior art compound. Here we're talking about the prior art in multiple references in a single paragraph. Say, take the claimed mutation and apply it to any one of the five SBA domains, including domain C. Not only that, the same paragraph tells you to do that for reasons of improving alkali stability. So a poser would apply these express teachings, which we see in multiple references as found by the board. And this is a very straightforward instance of a specific motivation to arrive at the claimed invention, not a new compound. And so I would suggest that this court's case law lead compound is talking about picking a compound out of a large number, typically for structural similarity reasons, and applying a separate optimization step, which is what's missing here. There is no separate optimization step needed here. It's simply applying straightforward teachings of what to start with, what to change, why to change it in a single paragraph. If this isn't an extraordinarily compelling case of obviousness, I'm not sure what is. So with that, unless there's any questions, I'll shift to the inherency case law question that you raised. And really the bottom line is this. In re cuvaris, hospira, centaris, Persian, they all stand for the proposition that what you're talking about is an inherent property of the claim subject matter, and especially if it's a mechanism of action, which is what this case is about. It simply doesn't add patentable weight. When you talk about the cases that Sativ is relying upon, they're simply saying in those cases it's an unremarkable proposition that you can't use inherency to either support motivation to combine or to provide an expectation of success. And it makes sense. If you think about it, POSA can't be guided or motivated by the unknown. That's not what this case is about. We've separately shown, for reasons of alkali stability, that the claim structure is expressly disclosed all over the prior art. It was the worst kept secret in the industry. To then say that some separate inherent property that's going to be there necessarily, which again is based on Sativa's own patent representations, as well as their arguments in these proceedings, embracing it for purposes of unexpected results, they can, on the one hand, say, well, there's this inherent property we want to rely upon to boost up our claims, but if it's a mechanism of action, and that's all it is about how this binding works to isolate antibodies, that doesn't get patentable weight under this court's case law. Unless there are other questions, I wanted to just say 30 seconds on one other issue. And that is, there is a separate argument, independent on the cross-appeal of inherency, about a combination ligand that prior art such as Hober said you could have additional monomer units. If you wanted fab binding, you could have an additional monomer added to provide that property. We made this argument starting from our petitions. You didn't reference Hober in your petition, right? No, we didn't. Because what we did is we had the argument in every single ground, including the Hober ground, and we referenced back our argument about the additional monomer unit. But here's the point. Whether it was related to Hober or any other reference, we made this argument. We had nothing from the board on it. Not even an acknowledgment whatsoever. So there's that, but there's also the problem again of the board with the improper claim construction. We submit this case should end on inherency, but to the extent there's anything left to deal with, the board would have to sort out what to do about this combination ligand theory and what to do about the substantial evidence Janssen issue, given that they're applying the wrong construction. They don't even have the right construction in mind in terms of what these claims cover. So we submit the case should end on inherency, but there are certainly multiple issues that would need to be addressed on remand to the extent the court did not believe this case is an inherency case for all claims. Thank you. Ma'am, just a couple of minutes. Yes, sure. Three minutes. Thank you, Your Honor. I'd like to begin by addressing this mechanism of action point because I think that risks a certain degree of... I didn't hear the beginning. I'm sorry. I'd like to begin by addressing this mechanism of action point and its relationship with reasonable expectation of success. Binding to FAB is not the mechanism of action by which prior art ligands worked, so I think we need to sweep that to one side. The expectation that the board found is that these ligands, like the prior art commercial product using domain Z, would bind to the FC region of whole antibodies. The recognition that even with a G29A mutation, which in domain B caused a loss of FAB activity, in domain C it would preserve FAB activity while also preserving the stability benefits of the G29A mutation, that is an unexpected beneficial property that is different from the way these would be expected to act and the way these had been... Domain Z had been used in the prior art. So I think it's just wrong to try to pigeonhole the reasonable expectation case here into cases like Persian and cases like Camaras, where you're talking about just a mechanism of action or some recognition about something that's always happening anyway in your drug. This is a new novel ligand nobody had been using before that has an advantage over the other G29A modifications that as a class were found to be obvious under a KSR-style analysis. And it's error to just short-circuit reasonable expectation of success in those circumstances and say that the limitation requiring capability of FAB binding is of no patentable weight. And it's also error to not even address unexpected beneficial properties as a secondary indicia on the grounds that that's inherent anyway. Most unexpected properties of a compound are inherent to that compound. The question is whether there is some novel discovery that warrants patent protection, which the case here is not the case when you just have the pharmacokinetics that explain why a drug always works. So I think it's very important to separate those out. So you don't think that it is correct doctrinally to say if you have wholly independent of the property that the result turns out to have, a sufficient motivation to create it and a reasonable expectation of success in creating it and maybe even also success in meeting the goals, which here would be both stability after cleaning and binding, forget about FAB at the moment, that at that point any unexpected property is just immaterial. Not where the unexpected property lets you do something you couldn't do before, which is here purify FAB fragments that don't have the FC region that would have been known to bind. And where that does FAB, the requirement of a capability of FAB binding is not a property of this finite universe of known solutions of the board, finite universe of predictable solutions to accept the board's holding on the independent claims, but is a property of one particular ligand that we selected from that putatively obvious genus. I do think it's very different from a situation where a patentee in an attempt to gain some patentability on what is otherwise an obvious compound, a single compound, starts reciting properties of that compound in the claim and then argues that they wouldn't have been known. This is not only unknown, but contrary to the expectations of the POSA and independently useful. And independently useful to purify fragments. That's why we have such trouble with the inherency argument on the methods. And when you say fragment, you mean separated. Separated FRAG-FRAG. Even though the claim doesn't require it. We agree that the claim language encompasses both fragments and whole antibodies, the FAB portion of whole antibodies. But when you purify whole antibodies, all the data in the patent, all the data in the art are about separated fragments, and there's no real advantage anyone's pointed to binding to the FAB portion of a whole antibody in addition to the FC portion. Because you've got the whole thing. Because you've got the whole thing. You can grab something else. And so that's why the board was correct in what the board's finding was supported by substantial evidence that it would not have been obvious to purify FAB fragments where you know there's going to be FAB binding. And there was nothing else in the record for them to glom onto about whether inherently in purifying whole antibodies there's binding to a FAB portion of the antibody. Thank you. And since you've raised the cross appeal, your friend has about a minute to respond.  Thank you. Thank you, Your Honor. I just want to respond on the first point about this notion that the FC portion of the whole antibody makes the big difference and that's where the binding occurs. There's zero evidence of that presented by Sativa in these proceedings. My colleague didn't point you to any. In fact, that's contrary to what their patent says once again. Column 5, lines 32 to 37, referring to the present invention. All of what they allege to have the invention talks about the capability to bind to the FAB portion of antibodies, whole antibodies. And once again, they embraced this property in arguing unexpected results, appendix 1499, for the FAB method claims. They're stuck with these representations. That's the strategy they chose to pursue and it results in invalidation. Thank you, Your Honors. We thank both sides. The case is submitted. That concludes our proceeding for this morning.